## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SOPHIA ETKA**, 959 Felspar #3J San Diego, CA 92109<br><br>**KRISTOPHER MEAD**, 1710 Tannytown Rd Canton, MI 48188<br><br>      *Plaintiffs*,<br><br>v.<br><br>**ALEJANDRO MAYORKAS**, in his official capacity as Secretary of Homeland Security, 2707 Martin Luther King Jr. Ave SE Washington, D.C. 20528<br><br><u>Serve</u>: Merrick Garland, U.S. Attorney General<br>      950 Pennsylvania Avenue NW<br>      Washington, D.C. 20530<br><br><u>Serve</u>: Matthew Graves, U.S. Attorney for the<br>      District of Columbia<br>      950 Pennsylvania Avenue NW<br>      Washington, D.C. 20530,<br><br>      *DHS.* | Civil Action No.: 1:24-cv-<br><br><br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

COMES NOW, Plaintiffs Sophia Etka and Kristopher Mead ("Plaintiffs"), by and through undersigned counsel pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.* ("DCHRA"), and file this Complaint against DHS Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security ("DHS" or "DHS"), on the grounds and for the relief sought as follows:

**NATURE OF THE ACTION**

This action arises out of the intentional and malicious discrimination committed against Mr. Mead because of his disability and because of Ms. Etka's Christian faith. Mr. Mead and Ms. Etka (collectively, "Plaintiffs") are two federal law enforcement officers who serve our nation as Special Agents with the Department of Homeland Security's Homeland Security Investigations (HSI) agency.

The discriminatory and retaliatory acts complained of herein began when Plaintiffs reported to FLECTC[1] for the government's Criminal Investigator Training Program ("CITP") and HSI Special Agent Training ("HSI SAT")—both of which are required trainings Plaintiffs had to complete prior to being formally sworn in as Special Agents.

When Plaintiffs reported to FLETC in March of 2021, neither of them had been fully vaccinated against COVID-19 despite DHS' policy that required all special agents in-training be fully vaccinated. Despite the fact that there was no federal law or executive order compelling all FLETC students to be fully vaccinated, DHS took it upon itself to institute its own policy under which it did not matter whether any of the trainees had disability (such as Mr. Mead) or their sincerely held religious beliefs prohibited compliance with DHS' vaccination policy (as is the case for Ms. Etka). The issue here is the fact that DHS enforced its vaccination policy in utter disregard of Mr. Mead's disability and Ms. Etka's sincerely held religious beliefs.

**PARTIES**

1.     Sophia Etka ("Ms. Etka") is a Christian and an adult resident of the State of California and a federal agent employed by the Department of Homeland Security. DHS employs

---

[1] The term "FLETC" refers to the federal law enforcement officers training centers in Glynco, Georgia where Plaintiffs were required to attend and complete training prior to being formally sworn in asHSISpecial Agents.

more than twenty-five (25) persons, and therefore, DHS qualifies as an employer as intended by 42 U.S.C. § 12111(5).

2.      Kristopher Mead ("Mr. Mead") is a Christian and an adult resident of the State of Michigan and a federal agent employed by the Department of Homeland Security. DHS employs more than twenty-five (25) persons, and therefore, DHS qualifies as an employer as intended by 42 U.S.C. § 12111(5).

3.      Defendant Alejandro Mayorkas ("Secretary Mayorkas") is the United States Secretary of Homeland Security, located at 2707 Martin Luther King Jr. Avenue SE, Washington, D.C. 20528. Secretary Mayorkas is sued in his official capacity.

## JURISDICTION & VENUE

4.      Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12117, both of which provide for original jurisdiction for Plaintiffs' claims arising under the laws of the United States.

5.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims brought pursuant to the D.C. Code and District of Columbia common law, in that such claims are so closely related to Plaintiffs' federal claims providing the basis for this Court's original jurisdiction as to satisfy the same case or controversy requirement prescribed by Article III of the United States Constitution.

6.      In the alternative, this court has diversity jurisdiction over all claims alleged in this action in that Plaintiffs are California and Michigan residents, respectively, and Defendant is a citizen of the District of Columbia for diversity jurisdiction purposes.

7.      Venue is proper pursuant to U.S.C. §1391 in that DHS is a resident of the District of Columbia, and a substantial portion of the events and decision-making behind the events giving rise to this action occurred in the District of Columbia.

8.      Venue is also proper pursuant to 42 U.S.C. § 2000e-(5)(f)(3) because the alleged unlawful employment practices were committed within this district, the employment records relevant to the alleged unlawful employment practices are maintained in this district, and DHS maintains its principal office in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

**A.  SOPHIA ETKA**

9.      On April 4, 2022, Ms. Etka initiated contact with an Equal Employment Opportunity ("EEO") Counselor.

10.      On April 18, 2022, Ms. Etka was notified that she completed her intra-agency EEO Counseling process with DHS' U.S. Immigration and Customs Enforcement ("ICE") agency.

11.      On April 28, 2022, Ms. Etka filed her formal complaint with DHS' EEO Office and with the Equal Employment Opportunity Commission ("EEOC").

12.      On July 10, 2023, DHS Office for Civil Liberties and Civil Rights (CRCL) issued Ms. Etka a procedural dismissal, alleging that her formal complaint against DHS failed to state a claim.

13.      Ms. Etka then timely appealed her dismissal to the Equal Employment Opportunity Commission ("EEOC") and on August 7, 2024, the EEOC issued the final decision in regard to her DHS charge of discrimination HS-ICE-01609-2022.

14.      Because Ms. Etka files this action within ninety (90) days of the EEOC's dismissal of her appeal, Ms. Etka has fully exhausted er administrative remedies and satisfied all conditions precedent to maintaining this action.

**B.  KRISTOPHER MEAD**

15.      Mr. Mead filed two intra-DHS complaints: HS-ICE-00461-2022 and HS-ICE-01704-2022. Both complaints were consolidated into OFO Docket. No. 2023004767.

### (i) CHARGE NO. HS-ICE-00461-2022

16.     On or about November 19, 2021, Mr. Mead initiated contact with the Equal Employment Opportunity (EEO) Counselor regarding the claims and allegations raised herein.

17.     On December 28, 2021, Mr. Mead filed his formal complaint/charge of discrimination.

18.     On July 27, 2023, DHS Office for Civil Liberties and Civil Rights (CRCL) issued Mr. Mead a procedural dismissal, alleging that his formal complaint against DHS failed to state a claim.

19.     On August 17, 2023, Mr. Mead appealed the CRCL's dismissal of Charge No. HS-ICE-00461-2022.

### (ii) CHARGE NO. HS-ICE-01704-2022

20.     On February 28, 2022, Mr. Mead initiated contact with the EEO Counselor regarding his second complaint/charge of discrimination.

21.     On July 27, 2023, CRCL issued Mr. Mead a procedural dismissal for an alleged failure to state a claim.

22.     On August 17, 2023, Mr. Mead appealed the CRCL's dismissal of Charge No. HS-ICE-01704-2022.

23.     On July 9, 2024, Mr. Mead received the final decision on his appeal.

24.     Because Mr. Mead files this action within ninety (90) days of the EEOC's dismissal of his appeal, which consolidated the aforesaid charges into one appeal, he has fully exhausted his administrative remedies and satisfied all conditions precedent to maintaining this action.

//

//

//

## STATEMENT OF FACTS

### I. BACKGROUND

25.     Mr. Mead began his employment with the federal government working for Immigration and Naturalization Services ("INS") [2] in July 2003. Following the dissolution of INS, Mr. Mead continued his service under DHS, where his role was prescribed to the duties under DHS' Customs and Border Protection (CBP) agency.

26.     Mr. Mead served as a CBP Officer until August 30, 2020; at which time he was extended a career advancement opportunity to become a Special Agent with the DHS Homeland Security Investigations agency ("HSI").

27.     Similarly, on or about May 13, 2018, Ms. Etka began her employment with DHS where she also served as a CBP Border Patrol Agent until September 13, 2020, at which time she was extended a career advancement opportunity to become a Special Agent with the DHS Homeland Security Investigations agency ("HSI").

28.     This training is commonly referred to as "FLETC".[3]

### II. FLETC SPECIAL AGENT TRAINING : THE CITP AND HSI SAT

29.     On or about March 13, 2021, Plaintiffs received the directive to report for duty and begin their required FLETC training.

30.     FLETC is comprised of two different training programs: the first part is the Criminal Investigator Training Program (CITP), and the second part is the HSI Special Agent Training (HSI SAT).

---

[2] INS was a sub-agency within the Department of Justice; however, in 2003, INS was dissolved, and its functions were transferred to the newly created Department of Homeland Security, which itself was split into three agencies: the U.S. Citizenship and Immigration Services (UCIS) the U.S. Immigration and Customs Enforcement (ICE) and the U.S. Customs and Border Protection (CBP).

[3] This is the term used to describe the training most federal law enforcement officers are required to complete prior to being fully sworn in to their respective positions. The training takes place at the Federal Law Enforcement Training Centers ("FLETC").

31.     The CITP is the foundational training program required for all federal law enforcement officers and includes HSI Special Agent trainees. CITP provides the essential investigative skills that HSI Special Agents and other federal law enforcement officers must acquire to perform their duties effectively.

32.     CITP is conducted at the Federal Law Enforcement Training Center (FLETC) and typically lasts approximately 12 to 13 weeks and upon its successful completion, trainees receive their certifications as Criminal Investigators.

33.     The HSI Special Agent Training (HSI SAT) program requires attendees to have earned their Criminal Investigator certification through the CITP as a condition precedent and the HSI SAT program lasts an additional 13 to 14 weeks.

34.     HSI Special Agents must complete both, the CITP and HSI SAT prior to being sworn in.

35.     In total, the CITP training and HSI SAT training takes a combined 25 to 26 weeks to complete, and each respective program must be completed start-to-finish in one session.

III. MEMBERSHIP IN PROTECTED CLASSES

36.     When Plaintiffs first reported to FLETC in March of 2021, neither Mr. Mead nor Ms. Etka had been fully vaccinated.

37.     Upon arrival, however, Plaintiffs learned for the first time that DHS had a requirement and policy of employment that mandated all special agents in-training become fully vaccinated.

38.     Prior to Mr. Mead's arrival, DHS knew that Mr. Mead was prohibited from becoming fully vaccinated against COVID-19 due to his disability.

39.     Specifically, in January of 2021 and while on duty working as a CBP Officer, DHS administered a dose of the COVID-19 vaccine to Mr. Mead. Within minutes, Mr. Mead found

himself in the emergency room where he was hospitalized directly and proximately because of the vaccination.

40.     As of January 2021, and well before Mr. Mead reported to FLETC, DHS knew and was otherwise placed on notice that he was prohibited from becoming fully vaccinated against COVID-19 by way of DHS' own observations, actions, experiences with Mr. Mead, through the written medical records in its possession regarding Mr. Mead's disability and inability to comply with DHS' mandatory vaccination policy, and as further evidenced by statements and conversations Mr. Mead had with DHS concerning the same.

41.     Likewise, DHS was placed on notice and otherwise knew at all times relevant, that Ms. Etka was also prohibited from becoming fully vaccinated against COVID-19 due to her sincerely held religious beliefs. Prior to hiring Ms. Etka as a Special Agent and before she reported to FLETC, DHS conducted an extensive background check and inquiry into Ms. Etka which revealed, among other things, that Ms. Etka is a pro-life Christian.

42.     More specifically, DHS knew and was on notice that Ms. Etka sincerely holds the religious belief that the Bible commands her to honor God with her body and that all life is created by God and begins at conception. Ms. Etka's church and her understanding of the Holy Bible teach her that all lives are to be protected, both born and unborn.

43.      Therefore, receiving a COVID vaccine would violate her deeply held beliefs about, first, honoring God in caring for her body, and second, advocating for the protection of sacred life. See Proverbs 31:8-9, Jeremiah 22:3, James 1:27.

44.     Due to the fact that all available COVID-19 vaccines were made, produced, derived, or otherwise manufactured and could not exist but-for the use of aborted fetal cell line tissues, Ms. Etka's sincerely held religious beliefs led her to understand that it would be a sin to receive any of the COVID-19 vaccines.

45.     Despite knowing that Mr. Mead's disability and Ms. Etka's sincerely held religious beliefs prohibited their compliance with DHS policy and DHS' knowledge of the well-established protections that require DHS to reasonably accommodate Plaintiffs, DHS ignored their lawful obligations and instead, embarked on discrimination-plagued crusade against Mr. Mead and Ms. Etka as soon as they arrived at FLETC in March 2021.

## IV.  DHS BEGINS DISCRIMINATING AGAINST PLAINTIFFS

46.     For example, DHS began discriminating against Plaintiffs upon their arrival to FLETC by forcing them to isolate in segregation from the rest of DHS' employees at FLETC because of Mr. Mead's disability and Ms. Etka's sincerely held religious beliefs.

47.     From March 20, 2021, until August 6, 2021. The fact that Plaintiffs' disability and sincerely held religious beliefs were the motivating factors behind the months-long period of isolated segregation to which DHS subjected Plaintiffs is evidenced by the fact that both vaccinated *and unvaccinated* DHS employees at FLETC were **not** required to isolate or required to quarantine, so long as they were not or disabled or religious.

48.     From March 20, 2021, non-disabled and non-religious DHS employees at FLETC who were not vaccinated were permitted to leave the FLETC Glynco Campus while Plaintiffs were required to isolate and segregate themselves—and if they had left the campus, DHS would have expelled them from the required training.

49.     Another example of DHS' discrimination is highlighted by the fact that Plaintiffs had to wear visual identifying markers on their bodies every day hey reported for duty from their respective isolated abodes.

50.     To exacerbate the impact and in furtherance of fostering a hostile work environment for Plaintiffs, each day upon reporting to class, DHS would intentionally draw animosity towards Plaintiffs. Specifically, DHS would force Plaintiffs to identify themselves by a showing of hands

and then continue to make disparaging remarks about Plaintiffs and the fact that they were not able to become fully vaccinated against COVID-19.

51.    It did not take long until DHS succeeded in fostering a hostile work environment. Shortly after it began singling out Plaintiffs to the rest of the DHS employees at FLETC, more and more DHS employees began to partake in the singling out and ridicule rituals, even going so far as to take it upon themselves to announce to the rest of Plaintiffs' classmates that Mr. Mead and Ms. Etka were present, knowing that in doing so, the ridiculing and cruel commentary about Plaintiffs would commence.

52.    Some of the specific comments DHS officials made towards Plaintiffs include:

a.   "Why don't you just get vaccinated and then you will be able to leave the campus"

b.   "Why don't you just lie and say you are vaccinated"

c.   "You're making too much of a big deal out of this"

d.   "Well, if you just got vaccinated then you wouldn't have been forced to leave"

e.   At graduation ceremony, "well, you finally made it."

f.   "How does it feel to be trapped on base while I get to go home this weekend and have fun."

g.   Every Monday morning, the class and instructor would discuss what happened over the weekend, like trips to the beach, or home to see family, or what restaurants were visited and Mr. Mead's answer was always, "Well, I'm not allowed to leave base because I'm being discriminated against," and the class president Rob Thomas said one time, "We know Kris and we're tired of hearing about it."

h.   In May of 2022 during Mr. Mead's second stint at FLETC, a few HSI classes gathered in one room as the base was being evacuated due to two students dying, which was being blamed on Covid. Mr. Mead asked if this was going to

affect those who were already removed from training before, and Frank Vinci said, "Kris, we want you gone even more than you want to leave."

53.     There were constant reminders that Plaintiffs could just get vaccinated and no longer be subject to discrimination.

54.     Eventually, it became apparent to Plaintiffs that this was not merely a campaign to discriminate against them through intentionally fostering a hostile work environment and subjecting them to disparate treatment on the basis of disability and religion; rather, the discrimination was so pervasive that it transformed into a mission to retaliate against Plaintiffs because of Mr. Mead's disability and Ms. Etka's sincerely held religious beliefs in hopes that the immense pressure, humiliation, and embarrassment would cause them to voluntarily withdraw from the FLETC training.

55.     There was absolutely no point to single Plaintiffs out on a daily basis. Everybody knew that Mr. Mead had a disability and everybody knew that Ms. Etka was a religious woman. Despite this, the intentional humiliation rituals continued each and every day.

56.      Eventually, the discrimination and retaliation increased to the point that DHS officials began walking into Plaintiffs' classrooms and disrupt the lessons solely to single them out and tell Plaintiffs "where they could get vaccinated on campus" — which of course, was information Plaintiffs had known for weeks, and the DHS employees doing this also knew Plaintiffs had knowledge as to where they could get vaccinated, too.

57.     This in-person humiliation and the intentional creation of a hostile work environment apparently was not enough. DHS then began harassing Plaintiffs even when they were in isolation.

58.     More specifically, DHS began sending barrages of text messages and e-mails to Plaintiffs, and in turn, more and more DHS employees joined in to the point that dozens of different DHS employees were harassing Plaintiffs simultaneously.

59.     But this still did not break Plaintiffs, and as a result, DHS began forcing Plaintiffs to wear a second visual identifier to ridicule and humiliate them. DHS knew that Plaintiffs were not sick; Plaintiffs did not exhibit any symptoms, nor did they have COVID-19. Nevertheless, DHS began forcing Plaintiffs to wear masks while non-religious and non-disabled DHS employees were *not* required to wear masks DHS, even if the employee had contracted COVID-19.

60.     The fact that this practice of forced masking was based on Plaintiffs' religion and disability is evidenced by the fact that at all times relevant, DHS knew or should have known that vaccinated persons can contract and transmit COVID-19 and wearing even the most closely-woven mask available, the N95, did not stop the spread of the virus. This is known because the largest COVID-19 particle ever detected measured at 0.09 micron, while the most closely knit hole in the N95 mask only stops particles as small as 0.27 micron—or three times the size of the largest COVID-19 particle ever detected.

61.     This still did not deter Plaintiffs or break them to the point of quitting. By August 2021, and despite the ongoing and continuous nature of the aforesaid discriminatory and retaliatory actions, Plaintiffs were nearly through the agony of DHS' discrimination at FLETC. They made it through the first twelve weeks of the CITP program, and they had already made it through approximately eight (8) weeks of the HSI SAT training. The final few weeks were all that Plaintiffs had left.

62.     Once DHS realized that Plaintiffs were not going to quit, it took drastic action and forced Plaintiffs out of FLETC without notice.

63.     On or about August 1, 2021, Plaintiffs were instructed that there would not be training the following day. DHS did not provide Plaintiffs any reason as to why.

64.     On August 2, 2021, there was no training, and Plaintiffs were told that they would not be training the following day, either. Again, DHS did not provide Plaintiffs with any reason as to why.

65.     In the early morning hours of August 3, 2021 and while Plaintiffs were still asleep, they were each awoken by loud bangs hammering at their respective doors. Upon awakening, Plaintiffs were ordered to immediately report to a test facility and submit to a COVID-19 test. This was not required of Plaintiffs' non-disabled and non-religious colleagues.

66.     When Plaintiffs inquired as to why they were being forced out of their beds in the early morning hours to take this test when neither Mr. Mead nor Ms. Etka were sick or otherwise even had signs of possibly having COVID-19, their inquiries were met with hostility and their question went unanswered. The only response they received was something to the effect of "shut up and just do it and stop asking questions."[4]

67.     Approximately 72 hours after having been forced out of bed to test, Plaintiffs were ordered to meet with senior DHS officials that day. Upon reporting to their respectively scheduled meetings, Plaintiffs were then told that they were being removed from FLETC and they had 48 hours to pack up their belongings and remove themselves from the FLETC Glynco Campus.

68.     DHS did not give Plaintiffs a reason as to why they were being forcibly removed from the FLETC campus.

69.     Out of curiosity and without any intent of actually following through, Ms. Etka inquired as to whether she would be permitted to remain at FLETC had she gotten vaccinated right

---

[4] This is a paraphrased quote as Plaintiffs cannot recall the verbatim response. Plaintiffs do recall and can confirm that the response was to this effect and did not answer their question as to why this was happening to them.

on the spot. DHS responded with a resounding "No" which further confirmed that Plaintiff's removal had nothing to do with whether she was or was not vaccinated.

70.    Plaintiffs were isolated, segregated, ridiculed, humiliated, and retaliated against because of Mr. Mead's disability and Ms. Etka's sincerely held religious beliefs every day for months, and they completed 90%[5] of the required FLETC training for nothing.

71.    To highlight the egregiousness of DHS' discriminatory misconduct, DHS not only allowed another non-religious Special Agent in-training who *tested positive* to remain at FLETC; even worse, DHS allowed one of its employees to meet the COVID-positive non-religious trainee at the FLETC Campus gate and then proceed to drive the infected individual's vehicle back to campus with the infected individual riding along in the passenger seat all to ensure this non-disabled and non-religious student—who also missed numerous days of training—was able to graduate on time with the rest of the non-religious and non-disabled trainees.

72.    But Plaintiffs, who were not COVID-positive nor even exhibiting symptoms of any kind, were nevertheless forced to leave FLETC.

73.     On or about August 6, 2021, Plaintiffs left FLETC for the first time in more than five (5) months, only having a mere 10% of their training left to complete. The other 90% of their training and all the aforesaid that they endured was for nothing.

74.    From August 2021 through March of 2022, Plaintiffs spent every single day wondering whether it would be their last day employed by the Department of Homeland Security.

## V.   EXECUTIVE ORDER 14043

75.    On September 9, 2021 and while Plaintiffs awaited any information about their respective futures, President Biden issued Executive Order 14043, which *inter alia* required all

---

[5] Plaintiffs were allowed to complete 100% of the CITP program and ~80% of the HSI SAT for a combined total of 90% of their required FLETC training.

federal workers to become "fully vaccinated" against COVID-19 as a condition of continued employment. The only exception to the "fully vaccinated" requirement was in the event an agency granted an agency employee's request for a reasonable accommodation based on his or her disability or sincerely held religious beliefs.

76.     In light of the fact that this order expressly stated that federal employees could request and obtain accommodations to the "fully vaccinated" requirement that mirrored the internal policy DHS had implemented on its own as early as March of 2021, Ms. Etka submitted a religious accommodation request to the "fully vaccinated" requirement based on her sincerely held religious beliefs.

77.     Similarly, Mr. Mead also submitted a medical accommodation request based on the aforesaid disability described above and the records and injuries known to DHS since January 2021 and before he even arrived at FLETC the first time.

78.     Yet despite the obligations under both well-established federal laws such as the ADA, Rehabilitation Act, and Title VII and President Biden's executive order, DHS continued to ignore the law and continued to abide by its own policy that requires absolute compliance with its pro-vaccination preferences without exception and in abject disregard of Plaintiffs' rights to be free from workplace discrimination on the basis of disability and religion, as more fully explained below.

VI.  PLAINTIFFS RETURN TO FLETC & FACE INCREASED HOSTILITY AND DISCRIMINATION

79.     This mental anguish and stress went on for months, until finally Plaintiffs received an email on or about March 4, 2022, advising that Plaintiffs could return to FLETC for training, but the catch was that they would be required to complete the entire HSI SAT portion of the training if they did return.

80.     Despite the adversity they had already faced, Plaintiffs returned to FLETC to again complete their HSI SAT training that was scheduled to begin on or about April 6, 2022.

81.     Immediately upon their arrival, Plaintiffs were again subjected to isolation and segregation. DHS forced Plaintiffs, who had no symptoms or signs of illness, to isolate themselves for five (5) days without any explanation as to why they had to isolate while other non-disabled and non-religious and unvaccinated DHS employees were again permitted to roam about the campus freely and without any restraint.

82.     When Plaintiffs inquired as to why they were being discriminated against when they had just been invited back, Plaintiffs were faced with immediate hostility, anger, and backlash.

83.     J.T. Marshall, a fellow DHS employee, responded in a manner that was intended to instill fear and intimidation into Plaintiffs and convey the message that questions regarding the unlawful conduct would not be tolerated—which as explained below, was overtly admitted just a few days later.

84.     While being in forced isolation, Plaintiffs realized DHS' discrimination and retaliation against them had not dissipated but rather, remained just as present, pervasive, and real as it was from March to August of 2021.

85.     Only a matter of a couple days into their five (5) day forced isolation period Plaintiffs were advised that they now were required to submit to another test that other non-disabled and non-religious DHS employees were otherwise not required to take, irrespective as to their vaccination statuses. However, prior to submitting to the mandatory test, Plaintiffs also needed to sign a document that, ironically, was titled "Consent Form."

86.     DHS knew that forcing Plaintiffs to sign its "consent" form was unlawful as evidenced by the fact DHS only gave Plaintiffs two options: they could either (1) sign the

"consent" form and take the test; or as Mr. Vinci warned, Plaintiffs (2) would be expelled from FLETC for good.

87.    Naturally, having endured everything they had endured thus far, Plaintiffs held their tongue and heeded to Mr. Vinci's unlawful threats. Mr. Mead nor Ms. Etka asked any further questions, they signed their respective "consent" forms, and took their respective tests.

88.    The only additional thing that Plaintiffs did in this process was write three words under their signatures on the "consent" form: "Signed Under Duress."[6]

89.    Other than that, Plaintiffs did not push back in any other way as they were immensely on-edge and fearful that doing so would cause them to lose everything they had worked for and endured, and then simply returned to their respective locations of isolation and waited for further orders as the final disability and religiously motivated segregation period was coming to an end.

90.    A few hours after taking the test, HSI management sent Plaintiffs an email and ordered them to immediately meet DHS officials outside their isolation units. Plaintiffs were perplexed as to the fact that DHS forced Plaintiffs to attend and participate in a meeting, yet at the same time, DHS was prohibiting Plaintiffs from being involved or participating in classes.

91.    Upon arriving at the designated meeting place, HSI management personnel came over to Plaintiffs and immediately began berating them. DHS officials did not say hi, welcome Plaintiffs back, or otherwise extend the common courtesies any decent and respectful entity would have extended under these circumstances.

---

[6] The "consent" form was merely a form memorializing the discriminatory testing policy; and it was outdated.

92.     Instead, these DHS officials expressed their anger and claimed that they had an alleged "issue" arise during the aforementioned testing requirement and that an FLETC colleague was the individual responsible for reporting on Plaintiffs.

93.     After Mr. Vinci's anger-filed intimidation tactics came to an end, the lead DHS employee who was running the entire project told Plaintiffs that he "did not want to deal with [their] shit for the next three months."

94.     Mr. Vinci continued, saying **"if you feel you are being discriminated against, then keep it to yourself."** He then continued to claim that Plaintiffs "were not under duress as no one [was] holding a gun to [their] head[s]." Mr. Vinci then accused Plaintiffs of improperly taking their respective tests, which of course was not true due to the fact that DHS itself proctored Plaintiffs the entirety of the test, and them made mention of "writing on the exchange forms" and warned that Plaintiffs that "[they] better not ever do something like that again."

95.     Because of this meeting and how Plaintiffs were being treated, Plaintiffs began to fear Mr. Vinci any time he was around.

96.     Mr. Vinci's intimidation sadly had an impact on Plaintiffs. From that moment forward and throughout the entirety of the time Plaintiffs remained at FLETC during their second bout with the training, Plaintiffs felt as though they had to walk on egg shells, as their fear of being discriminated against and removed placed them under an exorbitant amount of stress in addition to the natural amount of stress they otherwise would have had due to the intensity and rigor of their law enforcement training.

97.     Plaintiffs continued to face discrimination as they were subjected to the same tactics intended to burden and make their lives significantly more difficult for no reason other than the fact that Mr. Mead has a disability and Ms. Etka sincerely holds religious beliefs, both of which respectively prohibit Plaintiffs from complying with DHS' unlawful mandatory

vaccination policy that demands strict compliance without exception; which is thus an unconstitutional and unlawful policy that runs afoul of Plaintiffs' guaranteed protections against employment discrimination.

98.     If there is a silver lining to these events, it is that Plaintiffs ultimately did graduate from their law enforcement officer training and have since been sworn in as Special Agents with the HIS.

99.     That being said, however, Plaintiffs are fundamentally entitled to seek redress for the series of reprehensible, intentional, and deliberate violations and discriminatory actions DHS perpetrated against them, not only in the interests of justice for Plaintiffs, but to bolster the fact that DHS should never treat anyone in a manner even remotely similar to the way it treated Plaintiffs again.

100.    As a result, Plaintiffs assert the following claims against DHS:

**COUNT I**
**DISABILITY DISCRIMINATION**
**Violation of the ADA**
(***Mr. Mead against DHS***)

101.    Mr. Mead incorporates by reference paragraphs 1- 100 as if fully set forth herein.

102.    Mr. Mead is a disabled person within the meaning of 42 U.S.C. § 12102(1). Mr. Mead suffers from allergies and has severe allergic reactions to *inter alia* one or more vaccinations including the COVID-19 vaccine. Mr. Mead's allergies are physical or mental impairments that substantially limit one or more of Mr. Mead's major life activities, such as caring for himself, performing manual tasks, eating, sleeping, breathing, learning, reading, concentrating, thinking, communicating, and working. Mr. Mead has been hospitalized because of his allergies and allergic reactions, including those triggered by the COVID-19 vaccines, and DHS has and continues to regard Mr. Mead as having such an impairment as defined by 42 U.S.C. §§ 12102(1)(C), 3(A).

19

103.     Mr. Mead is a qualified individual within the meaning of 42 U.S.C. § 12111(8).

104.     Mr. Mead, with or without a reasonable accommodation, can perform the essential functions of an HSI Special Agent based factors including but not limited to, his education, training, work experience, performance reviews, and personnel file.

105.     Mr. Mead, at all times relevant to this action, was an employee within the meaning of 42 U.S.C. § 12111(4).

106.     At all times relevant to this action, DHS was Mr. Mead's employer within the meaning of 42 U.S.C. § 12111(5). The Department of Homeland Security engaged in an industry affecting commerce and has more than 25 employees for each working day in each of 20 or more calendar weeks in the current and preceding years.

107.     Alejandro Mayorkas, in his official capacity as Secretary of the Department of Homeland Security, is and always has been at all times relevant, an agent of Mr. Mead's employer, the Department of Homeland Security, within the meaning of 42 U.S.C. § 12111(5).

108.     DHS had actual or constructive knowledge of Mr. Mead's disability at all times relevant to this action, in that DHS was in possession of Mr. Mead's medical records and history that spanned approximately nineteen (19) years of federal service time, and also included the medical records directly and proximately produced as a result of the injuries he sustained directly and proximately as a result of receiving the first dose of the COVID-19 vaccine while in the scope of his employment and as administered by DHS.

109.     DHS purposefully, willfully, intentionally, or recklessly subjected Mr. Mead to a hostile work environment by engaging in a series of actions, including:

        a.     **Harassing and ridiculing** Mr. Mead because of his disability;

        b.     **Threatening** Mr. Mead;

        c.     **Isolation and Segregation** – Mr. Mead was forced to isolate and segregate

from other DHS employees at the Federal Law Enforcement Training Center (FLETC) due to his disability, while non-disabled and unvaccinated DHS employees were not required to isolate or quarantine.

d.     **Visual Identifiers –** Mr. Mead was required to wear visible markers identifying him as unvaccinated and disabled, further distinguishing him from his peers.

e.     **Public Ridicule** – DHS officials made disparaging remarks in front of other DHS employees, drawing attention to Mr. Mead's inability to comply with the vaccination policy. They asked questions like, "Why don't you just get vaccinated?" and suggested he "just lie and say [he's] vaccinated."

f.     **Daily Humiliation Rituals** – Mr. Mead was singled out daily in front of colleagues and was asked to identify himself, leading to open ridicule by both DHS officials and other employees.

g.     **Hostile Work Environment** – DHS fostered an atmosphere where Mr. Mead and his colleague Ms. Etka were ridiculed openly by other DHS employees during classes and outside the classroom, which contributed to a hostile work environment.

h.     **Additional Visual Marking** – Mr. Mead was forced to wear masks, even when he was not sick or exhibiting any symptoms, while non-disabled employees who contracted COVID-19 were not subject to the same masking requirements.

i.     **Constant Testing and Isolation** – DHS singled out Mr. Mead for additional testing, including pulling him from his sleep for a COVID-19 test, despite his not being symptomatic. He was also required to submit to additional isolation

periods upon returning to FLETC for further training.

j.  **Unfair Expulsion** – Mr. Mead was expelled from FLETC with no explanation after enduring over 90% of the required training, despite not being sick, symptomatic, or COVID-positive, while other similarly situated non-disabled employees who had tested positive were allowed to stay and complete their training.

k.  **Increased Hostility Upon Return** – When Mr. Mead returned to FLETC in 2022, he was again forced into isolation without cause and faced additional hostility, including being forced to sign "consent forms" under duress and being berated by DHS officials during meetings.

l.  **Retaliation** – DHS continued to ignore Mr. Mead's disability and requests for reasonable accommodation, and instead retaliated against him by subjecting him to additional discriminatory practices, including publicizing his disability and requiring him to perform under different, harsher conditions than others.

m.  **Lack of Accommodation**: – Despite knowledge of Mr. Mead's disability and medical history, DHS failed to engage in the required interactive process to offer reasonable accommodations, instead enforcing its vaccination policy with no exceptions for disability.

110.  DHS committed the aforesaid acts or omissions with the intent to humiliate, ridicule, and insult Mr. Mead and as a direct and proximate result, Mr. Mead was subjected to a hostile work environment and disparate treatment directly and proximately because of his disability.

111.  DHS took these adverse employment actions against Mr. Mead and subjected him to a hostile work environment and disparate treatment because of his disability, which prohibited him from complying with DHS' mandatory vaccination policy. Mr. Mead is a

member of a protected class based on his disability, and Mr. Mead requested a reasonable accommodation to the DHS' mandatory vaccination policy and protested the unlawful discriminatory and retaliatory conduct to which DHS and its agents, including without limitation, Frank Vinci and J.T. Marshall, subjected Mr. Mead directly and proximately because of his disability.

112.    All allegations set forth herein violate the ADA.

113.    As a direct and proximate result of DHS' actions or omissions complained of herein, Mr. Mead sustained economic injuries in amount in excess of $75,001.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**COUNT II**
**HOSTILE WORK ENVIRONMENT**
**Violation of the ADA**
(*Mr. Mead vs. DHS*)

114.    Mr. Mead incorporates by reference paragraphs 1- 100, 109 as if fully set forth herein.

115.    Mr. Mead is a disabled person as defined by the ADA.

116.    Mr. Mead is qualified to perform the essential functions of his job with or without a reasonable accommodation.

117.    Mr. Mead is an employee and DHS is Mr. Mead's employer as covered by the ADA.

118.    DHS had actual or constructive knowledge of Mr. Mead's disability at all times relevant to this action, in that DHS was in possession of Mr. Mead's medical records and history that spanned approximately nineteen (19) years of federal service time, and also included the medical records directly and proximately produced as a result of the injuries he sustained directly and proximately as a result of receiving the first dose of the COVID-19 vaccine while in the scope

of his employment and as administered by DHS.

119.    DHS committed the aforesaid acts or omissions articulated in paragraph 109 with the intent to humiliate, ridicule, and insult Mr. Mead and as a direct and proximate result, Mr. Mead was subjected to a hostile work environment and disparate treatment directly and proximately because of his disability.

120.    DHS took these adverse employment actions against Mr. Mead and subjected him to a hostile work environment and disparate treatment because of his disability, which prohibited him from complying with DHS' mandatory vaccination policy. Mr. Mead is a member of a protected class based on his disability, and Mr. Mead requested a reasonable accommodation to the DHS' mandatory vaccination policy or otherwise protested the unlawful discriminatory and retaliatory conduct to which DHS and its agents, including without limitation, Frank Vinci and J.T. Marshall, subjected Mr. Mead directly and proximately because of his disability.

121.    All allegations set forth herein violate the ADA.

122.    As a direct and proximate result of DHS' actions or omissions complained of herein, Mr. Mead sustained economic injuries in amount in excess of $75,001.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

### COUNT III
**RETALIATION**
**Violation of the ADA**
**(*Mr. Mead vs. DHS*)**

123.    Mr. Mead incorporates by reference paragraphs 1- 100, 109 as if fully set forth herein.

124.    Mr. Mead is a disabled person as intended by the ADA.

125.    Mr. Mead is qualified to perform the essential functions of his job with or without a reasonable accommodation.

126.    Mr. Mead is an employee and DHS is Mr. Mead's employer as intended by the ADA.

127.    DHS had actual or constructive knowledge of Mr. Mead's disability at all times relevant to this action, in that DHS was in possession of Mr. Mead's medical records and history that spanned approximately nineteen (19) years of federal service time, and also included the medical records directly and proximately produced as a result of the injuries he sustained directly and proximately as a result of receiving the first dose of the COVID-19 vaccine while in the scope of his employment and as administered by DHS.

128.    Mr. Mead engaged in protected activity by requesting an accommodation for his disability after being discriminated against on the basis of that disability, and by protesting DHS' ongoing unlawful discriminatory and harassing conduct.

129.    DHS purposefully, willfully, intentionally, or recklessly retaliated against Mr. Mead by engaging in a series of adverse actions as set forth in paragraph 109.

130.    All allegations set forth herein violate the ADA.

131.    As a direct and proximate result of DHS' actions or omissions complained of herein, Mr. Mead sustained economic injuries in amount in excess of $75,001.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**COUNT IV**
**DISPARATE TREATMENT**
**Violation of The Rehabilitation Act**
***(Mr. Mead against DHS)***

132.    Mr. Mead incorporates by reference paragraphs 1- 100, 109 as if fully set forth herein.

133.    Mr. Mead is a disabled person, a member of a protected class, and qualified individual as defined by The Rehabilitation Act.

134.    Mr. Mead is an employee, and DHS is Mr. Mead's employer as covered by The Rehabilitation Act.

135.    DHS had actual or constructive knowledge of Mr. Mead's disability at all times relevant to this action.

136.    Mr. Mead experienced adverse employment action and a materially adverse change in the terms and conditions of his employment based on the allegations articulated in paragraph 109.

137.    DHS committed the aforesaid acts or omissions articulated in paragraph 109 with the intent to humiliate, ridicule, and insult Mr. Mead and as a direct and proximate result, Mr. Mead was subjected to a hostile work environment and disparate treatment directly and proximately because of his disability.

138.    Mr. Mead experienced adverse employment action and a materially adverse change in the terms and conditions of his employment based on the allegations articulated in paragraph 109.

139.    DHS took these adverse employment actions against Mr. Mead and subjected him to a hostile work environment and disparate treatment because of his disability, which prohibited him from complying with DHS' mandatory vaccination policy. Mr. Mead is a member of a protected class based on his disability, and Mr. Mead requested a reasonable accommodation to the DHS' mandatory vaccination policy and protested the unlawful discriminatory and retaliatory conduct to which DHS and its agents, including without limitation, Frank Vinci and J.T. Marshall, subjected Mr. Mead directly and proximately because of his disability.

140.    All allegations set forth herein violate the Rehabilitation Act.

141.    As a direct and proximate result of DHS' actions or omissions complained of herein, Mr. Mead sustained economic injuries in amount in excess of $75,001.00, including the

denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

### COUNT V
**HOSTILE WORK ENVIRONMENT**
**Violation of the Rehabilitation Act**
(*Mr. Mead against DHS*)

142.   Mr. Mead incorporates by reference paragraphs 1- 100, 109 as if fully set forth herein.

143.   Mr. Mead is a disabled person as defined by the Rehabilitation Act.

144.   Mr. Mead is qualified to perform the essential functions of his job if provided a reasonable accommodation by his employer.

145.   Mr. Mead is an employee, and DHS is Mr. Mead's employer as intended by the Rehabilitation Act.

146.   DHS had actual or constructive knowledge of Mr. Mead's disability at all times relevant to this action, in that DHS was in possession of Mr. Mead's medical records and history that spanned approximately nineteen (19) years of federal service time, and also included the medical records directly and proximately produced as a result of the injuries he sustained directly and proximately as a result of receiving the first dose of the COVID-19 vaccine while in the scope of his employment and as administered by DHS.

147.   DHS, with the intent to intimidate, ridicule, and insult Mr. Mead, created a hostile and abusive work environment by committing the acts or omissions articulated in paragraph 109.

148.   The aforesaid adverse employment actions occurred because Mr. Mead requested an accommodation and engaged in protected activity.

149.   All allegations set forth herein violate the Rehabilitation Act.

150.   As a direct and proximate result of DHS' actions or omissions, Mr. Mead sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional

opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**COUNT VI**
**DISPARATE TREATMENT BASED ON RELIGION**
**Violation of Title VII**
***(Ms. Etka against DHS)***

151.    Ms. Etka incorporates by reference paragraphs 1- 100 as if fully set forth herein.

152.    Ms. Etka is a religious person, a member of a protected class, and qualified individual as defined by Title VII.

153.    Ms. Etka is an employee, and DHS is Ms. Etka's employer as covered by Title VII.

154.    DHS had actual or constructive knowledge of Ms. Etka's sincerely held religious beliefs at all times relevant to this action.

155.    Ms. Etka experienced adverse employment action and a materially adverse change in the terms and conditions of her employment because of her sincerely held religious beliefs, and her membership in a protected class, including without limitation:

a.    **Harassing** Ms. Etka because of her religion;

b.    **Isolation and Segregation** – Ms. Etka was forced to isolate and segregate from other DHS employees at FLETC due to her sincerely held religious beliefs, while non-religious and non-disabled unvaccinated DHS employees were not subjected to the same treatment.

c.    **Visual Identifiers** – Ms. Etka, like Mr. Mead, was required to wear visible markers identifying her as unvaccinated due to her religious beliefs, which distinguished her from her peers.

d.    **Public Ridicule** – DHS officials made disparaging remarks towards Ms. Etka in front of other DHS employees, mocking her for not being vaccinated. She was

asked, "Why don't you just get vaccinated?" and faced suggestions that she should "lie and say [she's] vaccinated."

      e.     **Daily Humiliation Rituals** – DHS officials forced Ms. Etka to raise her hand and identify herself as unvaccinated in front of her peers, which led to regular ridicule and disparaging comments from both DHS officials and other employees.

      f.     **Hostile Work Environment** – DHS fostered an atmosphere where Ms. Etka was constantly ridiculed by her colleagues and DHS officials, contributing to a hostile work environment based on her religious beliefs.

      g.     **Religious Beliefs Dismissed** – DHS knew of Ms. Etka's religious objection to the COVID-19 vaccine, as her religious beliefs prohibit receiving vaccines derived from aborted fetal cells. Despite this knowledge, DHS ignored her accommodation requests and forced her to comply with isolation and segregation practices.

      h.     **Unfair Expulsion** – Like Mr. Mead, Ms. Etka was expelled from FLETC after completing more than 90% of her training, despite not being sick or COVID-positive. Non-religious trainees who had tested positive for COVID-19 were allowed to stay and finish their training.

      i.     **Comments Mocking Religious Beliefs** – DHS officials and colleagues made comments mocking Ms. Etka's religious objections, such as asking, "Why don't you just get vaccinated?" or minimizing her religious stance by saying, "You're making too much of a big deal out of this."

      j.     **Failure to Accommodate Religious Beliefs** – Despite being on notice of Ms. Etka's religious objection, DHS refused to accommodate her request for a religious exemption to the vaccine mandate, as required by law. DHS did not review, acknowledge, or respond to her religious accommodation requests.

k.    **Hostility upon Return to FLETC** – When Ms. Etka returned to FLETC in 2022, she was once again forced into isolation, even though she showed no symptoms of illness. This isolation was only applied to her and Mr. Mead, not to other unvaccinated, non-religious employees.

l.    **Coercion and Intimidation** – DHS officials, including Frank Vinci, used intimidation tactics to pressure Ms. Etka into compliance, telling her to "keep it to [herself]" if she felt discriminated against, and berating her for her refusal to get vaccinated based on her religious beliefs.

m.    **Exclusion from Activities and Conversations** – During the training, Ms. Etka was excluded from conversations about weekend activities and leisure events, with her classmates openly dismissing her isolation by saying they were "tired of hearing about it." This amounts to a substantial change in terms and conditions of Ms. Etka's employment directly and proximately caused by her sincerely held religious beliefs.

n.    **Punitive Treatment Due to her Sincerely Held Religious Beliefs** – Ms. Etka was subject to heightened monitoring, more stringent isolation requirements, and constant reminders about her inability to leave campus, solely because of her religious beliefs, while non-religious employees were free to move about campus and interact with others without restrictions.

o.    **Disparate Treatment in Job Functions** – DHS altered the terms of Ms. Etka's employment, limiting her duties and responsibilities. These changes adversely affected her ability to advance her career, and her tasks were different from those assigned to non-religious employees.

      p.      **Ignoring her Religious Accommodation Request** – DHS intentionally modified and confused the process for religious accommodation requests, making it more difficult for Ms. Etka to seek accommodations and providing no response to her requests

      q.      **Fear of Retaliation** – Ms. Etka was subjected to retaliatory behavior from DHS for filing complaints and requesting accommodations based on her religious beliefs, including threats of disciplinary action and termination.

156.    DHS committed such actions with the intent to humiliate, ridicule, and occurred because Ms. Etka requested an accommodation and engaged in protected activity, including the exercise of her fundamental right to freely exercise her religion and be free from workplace discrimination based on her religion.

157.    All allegations set forth herein violate Title VII.

158.    As a direct and proximate result of DHS' actions or omissions, Ms. Etka sustained economic injuries in amount in excess of $75,001.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**COUNT XV**
**RETALIATION**
**Violation of Title VII**
(***Ms. Etka against DHS***)

159.    Ms. Etka incorporates by reference paragraphs 1- 100, 155 as if fully set forth herein.

160.    DHS engaged in systemic retaliation against Ms. Etka because she protested, opposed, and/or spoke out against DHS' disability discrimination.

161.    DHS' aforesaid retaliatory action was intentional, deliberate, willful, and conducted in callous disregard of Ms. Etka's rights.

162.    In retaliation for engaging in protected activity, DHS subjected Ms. Etka to adverse employment action as articulated in paragraph 155.

163.    DHS' retaliation against Ms. Etka as a result of her opposition to the aforesaid disability discrimination and engagement in protected activity violates Title VII.

164.    As a direct and proximate result of DHS' retaliation, Ms. Etka sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.


### ATTORNEY'S FEES

165.    Plaintiffs are entitled to an award of attorney's fees and reimbursement of the costs and expenses incurred in relation to prosecuting this action pursuant to Title VII, 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 12205 as well as other applicable statutory provisions under which this action is brought.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter judgment in their favor; award Plaintiffs such relief as to make them whole and remedy the aforesaid violations; hold Defendant liable, and in doing so, award all legal and equitable relief provided by law, including but not limited to:

    a.  Declaratory relief finding DHS' actions in discriminating against Mr. Mead on the basis of his disability are unconstitutional;

    b.  Declaratory relief finding DHS' actions in discriminating against Ms. Etka on the basis of her religion are unconstitutional;

    c.  Compensatory damages in the amount of $500,000.00;

    d.  An award of reasonable attorney's fees and litigation costs; and

e.   Any such other relief this Honorable Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 7, 2024

Respectfully submitted,

/s/ *Rachel Rodriguez*
Rachel L.T. Rodríguez, Esq.
VIRES LAW GROUP PLLC
DC BAR #501324
515 N. Flagler Dr., Suite 350
West Palm Beach, FL 33401
Tel: (561) 370-7383
rrodriguez@vireslawgroup.com

/s/ *Nicole C. Pearson*
Nicole C. Pearson*
YODER DREHER PEARSON LLP
201 Via Oporto, Suite 201
Newport Beach, CA 92663
Tel: (202) 595-4504
npearson@ydplaw.com
*awaiting admission on 11/4/24,
 pro hac vice forthcoming*

*Counsel for Plaintiff*